**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| GEORGE A. BROOKS, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. AW-06-1024 |
| MOTSENBOCKER ADVANCED DEVELOPMENTS, INC., *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \*

## MEMORANDUM OPINION

This action involves a suit brought by George A. Brooks ("Brooks" or "Plaintiff") and Brooks Industries, Inc. against Motsenbocker Advanced Developments, Inc. ("Motsenbocker"), Gregg Motsenbocker, and Skip Motsenbocker (collectively "Defendants") for breach of contract, misrepresentation, and related claims. Currently pending before the Court is Defendants' Motion to Dismiss for Lack of Jurisdiction, or in the alternative, To Transfer the Case and Stay Discovery (Paper No. 10). On December 5, 2006, the Court heard oral arguments on the motion in open court. The Court has reviewed the entire record, including the Pleadings with respect to the instant motion and the arguments of counsel. For the reasons stated below, the Court will grant Defendants' motion to dismiss.

### FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to Plaintiffs. Brooks is a resident of Prince George's County, Maryland and Brooks Industries is a Maryland corporation with its principal place of business in Prince George's County, Maryland. Motsenbocker is a California corporation with its principal place of business in San Diego, California. Individual Defendants

1

Gregg and Skip Motsenbocker are both residents of San Diego, California.

Motsenbocker owns patents (U.S. Patent Nos. 5,484,487 and 5,415,800) on a biodegradable, water-based, nonflammable, liquid cleaner used to remove paint and paint-like coverings and deposits (the "Product").  Motsenbocker markets and labels the Product as MÖTSENBÖCKER'S LIFT OFF® under that name and with various additional titles serving to identify particular uses and with, at times, a gel additive making it more suitable for particular uses.  In May 1998, Brooks purchased a bottle of the Product in a Maryland store marketed as a graffiti remover with a disclaimer that it is not to be used on painted wood and metal.  As an experiment, Brooks tested the Product as a stripper for removing clear coats from brass, finding that it worked well.  Brooks telephoned Motsenbocker and spoke to Gregg Motsenbocker.  After receiving assurances from Gregg Motsenbocker that he would not steal Brooks' ideas, Brooks related that following the death of workers stripping brass with flammable strippers, the painting industry was looking for a water-based brass stripper and that the Product seemed to fulfill this need.  Brooks proposed marketing it for Motsenbocker.

Motsenbocker agreed and allegedly arranged for Brooks to sign a contract with Ecolab.  At that time, Ecolab possessed the exclusive rights to market the Product wholesale under a distributorship/license agreement ("Distributorship Agreement") between Ecolab and Motsenbocker.[1]  In or about August 1998, Brooks entered into a written contract with Ecolab making Brooks the exclusive North American sales representative of the Product sold as a stripper

---

[1] The relationship between Motsenbocker and Ecolab began in 1996 and ended in 1999, more than five years before this action commenced.

2

to remove coatings such as paint, lacquers, and varnish.[2] The terms of the agreement allegedly included that Brooks would be paid exclusively by commission earning 12% of the first million dollars in sales, 10% of the next half million, and 8% thereafter. As the exclusive sales representative, Brooks was to receive his commission on all North American wholesale sales whether Brooks initiated it or not, and Brooks was to receive such for as long as Ecolab had the right to distribute the Product whether or not sold through any other sales representative. Ecolab granted Brooks these rights well beyond what a sales representative would normally have in recognition of Brook's contribution to the development of the Product.[3]

Brooks then chose the name "Brass Wash" and marketed it under that name. In 1999 on behalf of Motsenbocker, Brooks worked with The Sherwin Williams Company at its Cleveland, Ohio and Olive Branch, Mississippi laboratories to develop a water-based clear coat to protect metal and wood and that could also be removed with the Product when it came time to refinish the part or panel without leaving a stain on metal. At that time, all existing waterbased coats could not be used to cover metal and wood without tarnishing it. Brooks perfected a covering, Sherwin Williams produced it, and Motsenbocker marketed it under the name "MÖTSENBÖCKER'S LIFT OFF® Finish Coat" ("Finish Coat"), with Brooks entering into an agreement with Motsenbocker making Brooks the North American, exclusive sales representative of Finish Coat earning a commission of

---

[2] Other than Plaintiffs' contention that the contract existed, Plaintiff has produced no evidence of this contract.

[3] In disputing the existence of this contract, Motsenbocker asserts that it would never have "promised a commission on sales of [the Product] when the multi-billion dollar, multi-national Ecolab was required to pay $250,000, up-front, for an exclusive license to distribute [the Product]." *See* Reply Mem. in Support of Def. Mot. at 2.

10% on all sales, wholesale or retail.[4]  From in or about 1999 to 2005, Motsenbocker sold approximately $20,000 worth of Finish Coat, with Brooks earning a commission of approximately $2,000.

At some point in 1999, Gregg Motsenbocker on behalf of Motsenbocker traveled to Baltimore, Maryland and met with Brooks.  When meeting with Brooks, Motsenbocker offered to engage Brooks as the sales representative for the Product and Finish Coat, offering the same terms as Brooks' alleged contract with Ecolab, except that Brooks' commission would be a flat 10% and Brooks would earn a commission on retail as well as wholesale sales, and except that Brooks was free to market the Product under whatever name he and Motsenbocker agreed to and to work with Motsenbocker to vary the formula if doing so would improve it.[5]  Brooks accepted the offer, thus entering into an agreement (the "Agreement") with the understanding that Brooks would start marketing the Product under the Agreement as soon as Ecolab was no longer marketing the Product.

In August 2000, Brooks formed Brooks Industries, Inc., a janitorial service and seller of cleaning products.  Brooks Industries paid Motsenbocker for the samples Brooks distributed under the Agreement.  In 2004, when Brooks noticed that Gregg Motsenbocker had appeared to say that the Product with gel added was actually not covered by the Agreement with Brooks, Brooks asked

---

[4] Although Plaintiffs could not produce a written agreement, at oral argument Plaintiffs asserted that Brooks was to receive these commissions for the rest of his life (or at least for the life of the Product).

[5] The parties vigorously dispute this particular fact.  Defendants "categorically deny that they have ever met with either Plaintiff in Maryland."  *See* Reply Mem. in Support of Def. Mot. at 7.  This assertion is supported by the affidavit of Gregg Motsenbocker denying ever meeting with Plaintiffs in Maryland (Paper No. 12).  In response, Plaintiffs submit the affidavits of Brooks and Douglas Earnest averring that the meeting between Gregg and Brooks did occur in Maryland.

Gregg and Skip Motsenbocker about this. The Motsenbockers replied that Brooks could trust them and assured Brooks that he would receive his commissions and that the Motsenbockers would put something in writing. Under the Agreement, Brooks began marketing the Product and to experiment and further develop it and continued to do so until May 2005 when Motsenbocker breached the Agreement by refusing to acknowledge its existence.

## **STANDARD OF REVIEW**

The parties dispute what standard of review is applied to a personal jurisdiction challenge. The standard articulated by the Fourth Circuit is as follows:

> When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence. If the existence of jurisdiction turns on disputed factual questions the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. But when, as here, the court addresses the question on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a *prima facie* showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge. In considering a challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.

*Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). Plaintiffs contend that the law in this Circuit requires Plaintiff to only make a *prima facie* showing of jurisdiction. However, the Court has directed its consideration of Defendants' motion beyond merely the motion papers, memoranda, and allegations of Plaintiffs' complaint. Instead, the Court has considered the affidavits submitted by both parties, the Distributorship Agreement between Motsenbocker and Ecolab, the relevant patents covering the Product, the inventory and customer sales history of the Product, relevant magazine advertisements, and the list of the Product's retail dealers located in Maryland. The Court has also

considered the oral arguments of counsel.[6] Because its review has gone beyond the papers, the Court's consideration of the motion is certainly "evidentiary" in nature. As such, the burden on Plaintiffs is to prove the existence of jurisdiction by a preponderance of the evidence. Although the Court will construe all relevant pleading allegations in the light most favorable to the plaintiff, the Court will not and is not required to assume the credibility of Plaintiffs allegations. *See Combs*, 886 F.2d at 676 (requiring the district court to assume credibility when its consideration of the jurisdictional challenge is confined to the papers, and not additional evidence). Instead, the Court will make its determination based on the evidence produced by the parties.

## DISCUSSION

### A. Subject Matter Jurisdiction

Defendants contest the subject matter jurisdiction of this Court over this diversity action on the grounds that the amount in controversy is less than the minimum jurisdictional amount required under 28 U.S.C. § 1332. In *Shanaghan v. Cahill*, 58 F.3d 106 (4th Cir. 1995), the Fourth Circuit articulated the standard for determining whether the amount in controversy has been met.

> First, the court should look to the face of the complaint itself to determine whether it is a *legal certainty* that plaintiff's claims do not reach the required amount. Unless the claim for an amount over the jurisdictional prerequisite is made in bad faith, or unless it is plain from the complaint that an amount less than the jurisdictional amount is all that is at issue, the district court has jurisdiction over the case. This is akin to the "well-pleaded complaint" rule.

*Shanaghan*, 58 F.3d at 112 (emphasis added). Applying the *Shanaghan* test to the present case, the Court is unable to conclude that it is a legal certainty that Plaintiffs' claims do not reach the

---

[6] At oral argument, the Court asked Plaintiffs if Plaintiffs had any other evidence, other than that already before the Court, to establish this Court's personal jurisdiction over Defendants. Plaintiffs responded in the negative.

jurisdictional amount. Plaintiffs' Complaint alleges damages in excess of $2 million. With no evidence of bad faith before the Court, the Court will assume that Plaintiffs have met the amount in controversy requirement.

**B. Personal Jurisdiction**

A federal district court may only exercise jurisdiction over a non-resident defendant in the manner and extent authorized by state law in the forum state unless a federal statute establishes an alternative basis for exercising personal jurisdiction. *See* Fed. R. Civ. P. 4(k); *ePlus Tech. v. Aboud*, 313 F.3d 166, 175 (4th Cir. 2002). Thus, in a diversity case, a federal court only has personal jurisdiction over a party if a state court in the federal court's forum state would have personal jurisdiction. *Copiers Typewriters Calculators, Inc v. Toshiba*, 576 F. Supp. 312, 318 (D. Md. 1983). To evaluate whether personal jurisdiction exists in a diversity case, a federal court will engage in a two-part analysis. First, the court will determine whether the state long-arm statute authorizes the exercise of jurisdiction in the particular circumstances presented. Second, if the court finds that the long-arm statute permits the court to exercise jurisdiction, the court must then consider whether such an exercise of jurisdiction comports with the due process standards of the Fourteenth Amendment. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003); *Christian Sci. Bd. of Dir. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001); *Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993).

1. Maryland Law on *In Personam* Jurisdiction

Because Plaintiffs filed this action in federal court in Maryland, this Court must first examine whether it may exercise personal jurisdiction over the Defendant under Maryland law. Maryland's long-arm statute provides, in pertinent part:

> (b) A court may exercise personal jurisdiction over a person, who directly or by an agent:
>
> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply goods, food, services, or manufactured products in the State; ...
>
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State ...

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b) (2006). Courts have interpreted Maryland's long-arm statute as coterminous with the limits of the Due Process Clause of the Fourteenth Amendment. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002). Therefore, "the statutory inquiry necessarily merges with the constitutional inquiry and the two inquiries become one." *Id.*

The exercise of personal jurisdiction over a non-resident defendant comports with the Due Process Clause only where the defendant has certain "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations and citations omitted); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 941-42 (4th Cir. 1994). As explained in *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997), the jurisprudence of minimum contacts developed to determine whether a defendant had a surrogate presence in the state. *Id.* at 623. Thus, a court must focus its inquiry on whether "a defendant's contacts with the forum state are so substantial that they amount to a surrogate for presence and . . . render the exercise of sovereignty just, notwithstanding the lack of physical presence in the state." *Id.* Where a defendant

purposefully availed himself of the privilege of conducting business in a particular forum, the defendant has sought both the benefits and protections of that state's laws. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). In such situations, "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.*; *see also Foster v. Arletty 3 Sarl*, 278 F.3d 409, 415 (4th Cir. 2002).

In considering the question of personal jurisdiction, the Supreme Court has drawn a distinction between "specific" and "general" jurisdiction. *See Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 414 (1984). Specific jurisdiction exists where a suit "arises out of" a defendant's contacts with the forum state. *Id.* General jurisdiction, which permits a court to subject a non-resident defendant to a suit in the forum wholly unrelated to any contact it has with the forum, exists only where a foreign defendant's in-state activities amount to "continuous and systematic" contact with the state. *Id.* at 414-15. The level of contact required for the exercise of general jurisdiction is significantly higher than that required for specific jurisdiction. *ESAB Group, Inc.*, 126 F.3d at 628.

2.  General Jurisdiction

Plaintiffs contend that the activities of Ecoloab, as Motsenbocker's agent, including product sales and distribution, negotiation and signing of contract with Brooks, and on-going relations with Brooks are sufficiently "continuous and systematic" to sustain general jurisdiction over Defendants. The only conduct of Motsenbocker independent of Ecolab's activities Plaintiffs assert tending to establish general jurisdiction is "repeating a lie to Brooks by telephone into Maryland over the course of years." Opposition to Mot. at 21. However, these alleged contacts are not the type of systematic conduct needed to confer general jurisdiction over these Defendants. Further, because

Plaintiffs have not proven by a preponderance of the evidence that Ecolab is in fact Defendants' agent for purposes of jurisdiction, the alleged conduct of Ecolab is not sufficient to establish general jurisdiction over Defendants.

3.  Specific Jurisdiction

According to Plaintiffs, the facts most relevant to the establishment of specific jurisdiction include: the maintaining of a distributor-agent in Maryland, the marketing of the Product through Ecolab in Maryland, the signing of a written contract in Maryland, having Gregg Motsenbocker travel to Maryland to orally modify the written contract. Plaintiffs contend these purposeful acts on the part of Defendants give this Court personal jurisdiction over Defendants under the Maryland long-arm statute. Plaintiffs principally rely on the Fourth Circuit holding in *Du-Al Corp. v. Rudolph Beaver, Inc.*, 540 F.3d 1230 (4th Cir. 1976).

In Du-Al Corp., a Maryland manufacturer sued an out-of-state distributor for breach of contract and violations of anti-trust laws where a small amount of the distribution was in Maryland. In finding jurisdiction under sections (b)(1), (3), and (4) of the Maryland long-arm statute, the Fourth Circuit noted:

> [I]n at least two respects the contract was to be performed by Beaver in Maryland, Beaver did perform in part in Maryland, and its performance is now alleged to be defective, incomplete, tortious, or in violation of the antitrust laws. In addition, Maryland was the site either of the final execution of the contract, or of steps preliminary to its execution. There is thus no doubt that in entering into and performing the contract Beaver *purposefully* availed itself of the *privilege of conducting activities* within the *forum State, thus invoking* the benefits and protections of its laws.

Du-Al Corp., 540 F.2d at 1233 (citation and internal quotes omitted) (emphasis in original). The court held that "Maryland courts could and would assert jurisdiction over a party to a contract in a suit for breach of that contract if the party has performed purposeful acts in Maryland in relation to

10

the contract, albeit preliminary or subsequent to its execution." *Id.* at 1232.

Plaintiffs argue that by having Defendants' agent enter into a written contract in Maryland with Brooks, by having its president travel into Maryland and enter into a an oral modification in Maryland, Maryland became the site of negotiating the contract, the site of its final execution, and the site of its modification.  Also, Plaintiffs submit that since Motsenbocker admits that it derives less than ½ of 1 percent of its sales in Maryland (Motsenbocker Affidavit ¶ 11), and this Court has found a company deriving ½ of 1 percent of its sales in Maryland to be quite significant and a justification for a finding of personal jurisdiction under section (b)(4) of the long-arm statute, *see United Merchants & Mfrs. Inc. v. David & Dash, Inc.*, 439 F. Supp. 1078, 1084-85 (1977), this Court has specific jurisdiction over Defendants.

However, Plaintiffs have produced nothing to dispute the fact that Motsenbocker has no offices, no telephone listing, and no employees in Maryland.  Plaintiffs essentially hang their hats on the activities between Plaintiffs and Ecolab.  Plaintiffs admit that Brooks initiated contact with Defendants in California, and even traveled to California to work for Motsenbocker as a painter and warehouseman.  Plaintiffs also took several promotional trips in marketing the Product.  Compl. ¶¶ 30-49.  However, Plaintiff has not convinced the Court that any of these activities were done at the request of Defendants.  The United States Supreme Court has explained that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253-54 (1958).  This Court has stated that "[i]n determining whether prior business negotiations in the forum state give rise to specific jurisdiction, the strongest factor is whether the defendant initiated the business relationship in some way." *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692 (D. Md. 2002).  Here, Plaintiffs

...

cannot rely neither on their unsupported legal conclusion that Ecolab was Motsenbocker's agent nor their unilateral activities with Defendants to establish personal jurisdiction.

Neither can Plaintiffs rely on a stream of commerce argument. In *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987), Justice O'Connor, although not writing for the majority, noted that

> [t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor *who has agreed to serve as the sales agent* in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi*, 480 U.S. at 112 (O'Connor, J.) (emphasis added).[7]

Here, there is no evidence that Ecolab agreed to serve as a sales agent in Maryland for Motsenbocker. Ecolab is a Delaware corporation with its principal place of business in Minnesota. Further, the Distributorship Agreement between Motsenbocker and Ecolab provided for the distribution of Motsenbocker's products throughout the U.S., Canada, and Mexico. There is no indication that Motsenbocker in any way deliberately targeted consumers in Maryland. "To permit a state to assert jurisdiction over any [company] in the country whose product is sold in the state simply because [the company] must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism." *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994).

---

[7] The issue of "minimum contacts" in the *Asahi* case produced three opinions, none of which garnered enough votes to constitute a majority.

With respect to Plaintiffs' section (b)(4) argument, the Court is not persuaded that the amount of revenue Motsenbocker has derived from Maryland is substantial enough to warrant the exercise of personal jurisdiction over Motsenbocker. Although this Court held in *United Merchants*, 439 F. Supp 1078 (D. Md. 1977), that revenue totaling ½ of 1 percent of a company's total sales was sufficient to confer jurisdiction, the facts of that case are distinguishable from those *sub judice*. In that case, the Court held that where the defendant regularly solicited business with Maryland entities, including a merchandising relationship with a Maryland company, and where the plaintiff had transacted more substantial business in the past with the defendant ($30,000 worth of infringing copyrighted drapery, created and manufactured specifically for shipment into Maryland, with knowledge that they would be used in Maryland), the defendant had purposefully availed itself of the forum, allowing the Court to establish specific jurisdiction over the drapery transaction.

The Fourth Circuit, on the other hand, held in *Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502 (4th Cir. 1956), cited by the court in *United Merchants*, that $17,000 in defective synthetic yarn was insufficient to establish personal jurisdiction over the defendant, where the out-of-state defendant had no offices, employees or agents in the forum state, made one sale, and only one trip into the forum state to discuss the plaintiff's complaint. Like the defendants in *Erlanger*, the Defendants here have no offices, employees, or agents in Maryland. Because Defendants' connection with the forum state is not as substantial as the connection in *United Merchants*, the Court does not believe the percentage of revenue here is substantial enough to make the exercise of personal jurisdiction comport with due process.

With regard to the individual Defendants, Plaintiffs allege that Gregg Motsenbocker made one trip into Maryland. In support of their contention that Gregg did travel to Maryland to meet

13

with Brooks, Plaintiffs submit the affidavits of Brooks, his assistant Douglas Earnest, and a former employee of Ecolab, Walter Noga.[8] Because the Court's review of the record in this case is evidentiary in nature, and not solely on the papers, the Court is not bound to assume the credibility of the affidavits submitted by Plaintiffs. *See Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). Plaintiffs must establish the existence of jurisdiction by a preponderance of the evidence, and with such weak evidence of Defendants' purposeful contacts with Maryland, Plaintiffs have failed to meet their burden.

Even if the Court assumes that Gregg Motsenbocker did travel to Maryland on this one occasion, the Court does not believe that this single contact is sufficient to satisfy constitutional due process. There is not sufficient evidence that a contract was entered into at this meeting. There is not sufficient evidence that Gregg Motsenbocker's purpose for coming into Maryland was to do business with Brooks, a Maryland resident. There is simply not enough here to indicate that Defendants purposefully availed themselves of the privileges of conducting business in Maryland. As the Court in *Erlanger* observed, "[w]e cannot shut our eyes to the disorder and unfairness likely to follow from sustaining jurisdiction in a case like this. It might require corporations from coast to coast having the most indirect, casual and tenuous connection with a State to answer frivolous law suits in its courts. To permit this could seriously impair the guarantees which due process seeks to secure." *Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502, 507 (4th Cir. 1956).

---

[8] Neither Mr. Earnest nor Mr. Noga have personal knowledge that Gregg met with Brooks in Maryland. Mr. Earnest drove Brooks to the hotel where the alleged meeting occurred, but did not see or personally observed Gregg as being present. Aff. of George Brooks. Mr. Noga only states that he "believes" the meeting occurred "sometime in 1999," and that "it is possible [he] traveled with Gregg to this meeting," although he "cannot remember this as fact." Aff. of Walter Noga.

Because Plaintiffs have failed to meet their burden, this Court cannot exercise personal jurisdiction over these Defendants.

**C. Transfer of Venue**

Defendants have asked, in the alternative, that this Court transfer this action to the United States District Court for the Southern District of California. Because the Court will dismiss this action for lack of personal jurisdiction, the Court need not reach the question of transfer.

## **CONCLUSION**

For all of the reasons stated above, the Court will GRANT Defendants' Motion to Dismiss for Lack of Jurisdiction (Paper No. 10). An Order consistent with this Opinion will follow.



Date:   <u>December 8, 2006</u>                                         <u>           /s/                        </u>
                                                                                            Alexander Williams, Jr.
                                                                                            United States District Judge